1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11   JOE TOMAS ORCASITAS, JR.,
      CDCR #J-36909,
12
                                    Plaintiff,
13
            vs.
14

15   DOCTOR KO, M.D.,

16                                  Defendant.
17
18
19
20

Case No. 21-cv-143-MMA (RBB)

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT; AND**

[Doc. No. 41]

**DENYING PLAINTIFF'S MOTION
TO APPOINT COUNSEL**

[Doc. No. 38]

21        Joe Tomas Orcasitas, Jr. ("Plaintiff"), a California inmate proceeding *pro se*,

22   brings this civil rights action pursuant to 42 U.S.C. § 1983, asserting that Dr. Ko

23   ("Defendant" or "Dr. Ko") violated his Eighth Amendment right to adequate medical

24   care. *See* Doc. No. 1.  Defendant now moves for summary judgment. *See* Doc. No. 41.

25   Plaintiff filed an opposition, to which Defendant replied.  Doc. Nos. 49, 52.  The Court

26   took the matter under submission without oral argument pursuant to Civil Local Rule

27   7.1.d.1 and Federal Rule of Civil Procedure 78(b).  For the reasons set forth below, the

28   Court **GRANTS** Defendant's motion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I. Background[1]

Defendant is a physician at Centinela State Prison ("CSP"), *see* Doc. No. 41-1 ("Ko Decl.") ¶ 2, and was Plaintiff's Primary Care Physician ("PCP") while Plaintiff was housed at CSP, *see id.* ¶ 5. On February 22, 2019, Plaintiff saw Defendant to address an injury to his right knee. Doc. No. 41-3 ("Defendant's Separate Statement" or "DSS") No. 1. At the appointment, Plaintiff reported to Defendant that he had twisted his knee two weeks prior while playing handball. DSS No. 2. Plaintiff reported that swelling of his knee began approximately six hours after the injury but went away after two days. DSS No. 3. Plaintiff also reported that since injuring his knee he had been walking and stretching and avoiding certain exercises. DSS No. 4. Plaintiff described feeling stiff in the morning and that it hurt when he tried to pivot on his right knee. *Id.*

Defendant examined Plaintiff's knee, including: looking for swelling, redness, and tenderness; administering four medically accepted tests to determine possible damage to various ligaments and cartilage of the knee; requesting that Plaintiff both squat and raise thighs to 90 degree; and having Plaintiff perform a pivot test on his right knee. DSS No. 5. Defendant concluded that Plaintiff had "no appreciable swelling," "[n]o redness," and "[n]o patellar or fibular head tenderness." DSS No. 6. Defendant did not order an MRI, believing that it was "neither medically indicated nor medically necessary" as Plaintiff had "no detectable pathologies," and was able to function independently. DSS No. 7. Instead, Defendant provided Plaintiff with an assessment and plan: limit certain exercises/movements, take Naproxen twice a day, give the knee time to heal, and follow-up as needed. DSS No. 8. Plaintiff never saw Defendant again regarding his knee injury or pain. DSS No. 9.

---

[1] These material facts are taken from Defendant's Separate Statement of Undisputed Facts, Doc. No. 41-3, together with the parties' supporting declarations and exhibits. Particular material facts that are not recited in this section will be discussed *infra*.

Around April 27, 2021, Plaintiff was transferred from CSP to California State Prison, Los Angeles County ("LAC").  Ko Decl. ¶ 22.  On June 21, 2021, Plaintiff had an X-ray performed on his right knee.  Def. Ex. HH.  Plaintiff was informed that the X-ray revealed "minimal degenerative changes" "incident to prior ACL," and that there was "[n]o acute osseous abnormality or joint effusion."  *Id.*

On September 9, 2021, Plaintiff was seen by his PCP at LAC to address his knee.  *See* Def. Ex. II.  At that time, Plaintiff's LAC PCP prescribed him a knee brace.  *See id.*

On February 28, 2022, Plaintiff had an MRI performed on his right knee.  *See* Pl. Ex. A-2.  Plaintiff met with Orthopedic specialist Dr. Alon Antebi on April 18, 2022 to review the MRI results.  *See id.*  The MRI revealed a "lateral meniscus tear, chondromalacia osteoarthritis," specifically, "M23.261 Derangement of other lateral meniscus due to old tear or injury, right knee [and] M17.11 Unilateral primary osteoarthritis, right knee."  *Id.*  At that time, Plaintiff received a cortisone injection.  *See id.*

On June 29, 2022, Plaintiff attended a follow-up visit with Dr. Antebi regarding his knee.  *See id.*  He again received a cortisone injection, which Dr. Antebi recorded was "20-30% effective."  *Id.*  At the June 29, 2022 appointment, Dr. Antebi informed Plaintiff that the "next step would be surgery," and so Plaintiff was to "proceed with right knee arthroscopy lateral meniscectomy."  *Id.*  The surgery was performed on October 24, 2022.  *See* Doc. No. 60.

## II. OBJECTIONS AND SUR-REPLY

As an initial matter, Defendant submitted new evidence with his reply: declaration of K. Martin, Doc. No. 52 at 10–12 ("Martin Decl.") along with two exhibits regarding Plaintiff's healthcare grievance history, *id.* at 14–15 ("Martin Ex. A"), *id.* at 16–25 ("Martin Ex. B"); declaration of Dr. Soleimani, *id.* at 26–28 ("Soleimani Decl."); and declaration of Dr. Sekhon, *id.* at 29–31 ("Sekhon Decl.").  Plaintiff has filed a response and objects to the three declarations submitted in reply.  Doc. No. 53.  Plaintiff does not specifically raise any evidentiary grounds for why the declarations are improper.

However, he asserts that these declarations should have been included with Defendant's motion for summary judgment and argues that they were submitted in bad faith and as a delay tactic. *Id.* at 1. The remainder of Plaintiff's filing responds to Defendant's reply memorandum and thus is a sur-reply.

"[T]he district court may decline to consider new evidence or arguments raised in reply, and generally 'should not consider the new evidence without giving the non-movant an opportunity to respond.'" *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) (first quoting *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); and then citing *Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774 MMM (CWx), 2006 U.S. Dist. LEXIS 96772, at *19 n.52 (C.D. Cal. Sep. 11, 2006)). Relatedly, a decision to grant or deny leave to file a sur-reply is committed to the "sound discretion" of the court. *De Souza v. Dawson Tech., Inc.*, No. 21-CV-1103 JLS (MSB), 2021 U.S. Dist. LEXIS 136089, at *2 (S.D. Cal. July 21, 2021) (quoting *Brady v. Grendene USA, Inc.*, No. 3:12-cv-0604-GPC-KSC, 2015 U.S. Dist. LEXIS 151879, at *8 (S.D. Cal. Nov. 6, 2015) (internal quotation marks omitted)). Such discretion "should be exercised in favor of allowing a surreply only when a valid reason for such additional briefing exists, . . ." *Hill v. England*, No. CV-F-05-869 REC/TAG, 2005 U.S. Dist. LEXIS 29357, at *2 (E.D. Cal. Nov. 8, 2005). For example, "[d]iscretion to grant leave to file a surreply is proper when a party has submitted new evidence with its reply brief." *Citizens for Quality Educ. San Diego v. San Diego Unified Sch. Dist.*, No. 17-cv-1054-BAS-JMA, 2018 U.S. Dist. LEXIS 77695, at *3 (S.D. Cal. May 7, 2018).

There is no evidence that Defendant's submission of the new declarations and exhibits in reply was done either in bad faith or as a delay tactic. Here, the Court will consider Defendant's new evidence because Plaintiff had the opportunity to and did in fact respond. To that end, the Court finds that Plaintiff's sur-reply is properly before the Court given that Defendant submitted three new declarations and two new exhibits in reply. Accordingly, the Court **OVERRULES** Plaintiff's objections.

//

### III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the "outcome of the suit" under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.*

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial.  *See Celotex*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the nonmoving party's position is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.  Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

Federal Rule of Civil Procedure 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or

denials in its own pleading." Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd*, 475 U.S. at 586–87. Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23.

The Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). While prisoners are relieved from strict compliance, they still must "identify or submit some competent evidence" to support their claims. *Soto*, 882 F.3d at 872.

# IV. DISCUSSION

Plaintiff alleges he had undiagnosed "torn, or partially torn ligaments in [his] right knee" and that Defendant denied his request for an MRI due to the cost. *See* Compl. at 3–4; *see also* Doc. No. 5 at 7. Defendant now moves for summary judgment, arguing that Plaintiff is not entitled to injunctive relief. Doc. No. 41 at 22. Defendant also asserts that he was not deliberately indifferent to Plaintiff's medical needs, or alternatively, that he is entitled to qualified immunity. *Id.* at 14, 23.

## A. Injunctive Relief

Defendant argues that Plaintiff's request for injunctive relief is both vague and moot. *See* Doc. No. 41 at 22–23. According to the Complaint, Plaintiff seeks to enjoin Defendant "from denying [him] proper medical care." Compl. at 7. However, Plaintiff has since been transferred from CSP to LAC and Defendant still works at CSP. *See* Ko Decl. ¶¶ 2, 22. As such, Plaintiff's request for injunctive relief against Defendant is moot. *See, e.g.*, *Gilbert v. Fernald*, No. CV 20-1269-SVW (KS), 2021 U.S. Dist. LEXIS 78079, at *9 (C.D. Cal. Mar. 4, 2021) (citing *Cockcroft v. Kirkland*, 548 F. Supp. 2d 767, 778 (N.D. Cal. 2008) ("Cockcroft's transfer to another prison make his injunctive relief requests moot.")). Moreover, as Dr. Ko is the only named defendant, the Court lacks the

authority to issue any injunctive relief as to any other doctors or prison officials at LAC. Accordingly, the Court **GRANTS** Defendant's motion on this basis and **DISMISSES** Plaintiff's request for injunctive relief.

**B.    Scope of the Complaint**

At the outset, the Court begins by addressing certain evidence and allegations that the Court finds are outside the scope of the Complaint.  In opposition to Defendant's motion, Plaintiff has come forth with evidence that he told various persons at CSP that he was in extreme knee pain after the February 22, 2019 appointment with Defendant.  *See, e.g.*, Doc. No. 49-3 ("Pl. Decl.") ¶ 9 ("I notified R.N. Alina Martinez at least (2) different times that is a minimum of (1) times medical staff was notified.").  He also contends that he told Defendant some 4–6 times following the initial appointment: "My knee is killing me! I have pain so bad I cannot sleep!"  Pl. Decl. ¶ 6.  Plaintiff later avers that he reported his severe pain and lack of sleep to Defendant "at least 5–6 times."  Pl. Decl. ¶ 9.  Plaintiff asserts that each time Defendant stated: "You are not here about your knee sir, you already 602'd me we are here for other matters!"  Pl. Decl. ¶ 7.  Defendant, on the other hand, contends that Plaintiff never raised the issue of his knee after the initial appointment.  Ko Decl. ¶ 14.  To that end, Plaintiff asserts that "[a]ll of these [complaints] were ignored by Primary care Physician Dr. Ko."  Pl. Decl. ¶ 9.  Plaintiff vigorously argues that Defendant failed to provide follow-up care out of "vindictiveness"—because Plaintiff "dared to 602 Defendant."  Doc. No. 49 at 13, 16. Plaintiff also contends in his sur-reply that this case is not limited to one day or one appointment but is based upon "a pattern of deliberate indifference by Defendant and staff."  *See* Doc. No. 53 at 2.

True, this evidence may reveal a triable issue of fact as to whether Defendant knew Plaintiff was in continuous pain following the February 22, 2019 appointment.  This evidence might also raise a triable issue of fact as to whether Defendant retaliated against Plaintiff for filing a grievance as a result of that appointment.  However, the Complaint contains no allegations regarding a pattern of deliberate indifference or any subsequent

failure to provide adequate medical care and therefore the Court agrees with Defendant that these contentions are outside the scope of the Complaint. *See* Doc. No. 52 at 7.

The Complaint is limited to one alleged act of deliberate indifference: Defendant's decision to not order an MRI at the February 22, 2019 appointment. *See* Compl. While Plaintiff contends in his Complaint that he is in ongoing pain, *see id.* at 4, he does not allege that Defendant knew the pain was ongoing or that he knew Plaintiff needed additional care. Further, there are no allegations that Defendant disregarded this information (for retaliatory reasons or otherwise) and instead continued with an allegedly ineffective treatment plan. Instead, as the Court noted in its Screening Order, Plaintiff pleads a claim against Defendant based upon the allegations that "he has undiagnosed 'torn, or partially torn ligaments in [his] right knee,' and that the only reason those conditions have not been diagnosed is Defendant Ko's concerns about the costs of ordering an MRI," Doc. No. 5 at 7 (quoting Compl. at 4), and only those allegations survived screening.

Although *pro se* prisoner pleadings are to be read and construed liberally, the Court cannot say that the Complaint put Defendant on notice that Plaintiff was challenging any care other than the initial denial of an MRI. In order to bring these allegations within the scope of the Complaint, the Court would need to supply essential, missing elements, such as that Plaintiff told Defendant he was in pain and that Defendant chose to do nothing and/or that Defendant chose to do nothing in retaliation for the grievance. The Court cannot read these essential allegations into the Complaint and to do so would be to expand this case beyond Defendant's notice. *See Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982) (stating that a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pleaded); *see also Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (holding that a plaintiff may not raise new allegations in opposition to a motion for summary judgment where the complaint does not give a defendant proper notice of those allegations). Moreover, the grievance Plaintiff exhausted prior to bringing

this case, transcribed in full below, was filed five days after the February 22, 2019 appointment and similarly makes no mention of any alleged subsequent failure to provide care. *See* Martin Ex. B (dated 2/27/2019). Therefore, even assuming the Court was inclined to read these allegations into the Complaint, they would not be exhausted.

Accordingly, the Court declines to consider these new allegations. *See Singh v. Nicolas*, No. 2: 19-cv-2048 KJN P, 2022 U.S. Dist. LEXIS 177427, at *39 (E.D. Cal. Sep. 28, 2022) (declining to consider new claims regarding the failure to prescribe a cotton ball and retaliation for filing a grievance, raised for the first time in opposition to summary judgment). The Court therefore proceeds by assessing solely whether Defendant's decision to not order an MRI on February 22, 2019 violated Plaintiff's Eighth Amendment right to adequate medical care.

## C.   Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). The Eighth Amendment's Cruel and Unusual Punishment Clause is violated when prison officials provide inadequate medical care in a manner that is deliberately indifferent to a prisoner's serious medical needs. *See Estelle*, 429 U.S. at 105. Medical needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

To show "cruel and unusual" punishment under the Eighth Amendment, Plaintiff must point to evidence in the record from which a trier of fact might reasonably conclude that Defendant's medical treatment placed him at risk of "objectively, sufficiently serious" harm and that Defendant had "sufficiently culpable state[s] of mind" when he either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (internal quotations omitted). Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *Toguchi*, 391 F.3d at 1057 ("To establish an Eighth Amendment

violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)).

The objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted); *see also Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("serious" medical conditions are those a reasonable doctor would think worthy of comment, those which significantly affect the prisoner's daily activities, and those which are chronic and accompanied by substantial pain).

The subjective component requires Plaintiff to demonstrate that Defendant had the culpable mental state: "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  Deliberate indifference is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Toguchi*, 391 F.3d at 1057.  Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

### 1.   *Objectively Serious Injury*

Defendant first argues that Plaintiff did not present with a serious medical need at the February 22, 2019 appointment.  *See* Doc. No. 41 at 15.  Plaintiff argues that his injury was sufficiently serious because he "has/had" a torn lateral meniscus, which causes daily, constant pain that is so severe it causes lack of sleep.  *See* Doc. No. 49 at 3.

It is undisputed that on February 6, 2019, while at CSP, Plaintiff sustained an injury to his right knee while playing handball.  Def. Ex. D.  On February 9, 2019,

Plaintiff requested medical treatment, Def. Ex. JJ, and was seen by Nurse Manaig on February 11, 2019.  Def. Ex. D.  In his request, Plaintiff reported "EXTREME PAIN/DUE TO POSSIBLY RE-TEARING LIGAMENTS, PER PATIENT."  *Id.*  Nurse Manaig recorded "Yes actual or suspected pain" to the question of "Pain Present."  *Id.*  Nurse Manaig commented that Plaintiff had "torn [his] ACL with repair [in] 1986."  *Id.*  Plaintiff reported that his pain was a level 7 on the one to 10 numeric pain scale.  *Id.*

Nurse Manaig recorded that Plaintiff's right knee had an old surgical scar, and that Plaintiff had "tenderness when fully flexing left knee."[2]  *Id.*  Nurse Manaig also recorded that there was no swelling, discoloration, or dislocation of the right knee.  *Id.*  At this time, Nurse Manaig "deferred" assessing a treatment plan to Plaintiff's PCP.  *Id.*

Defendant, as Plaintiff's PCP, *see* Koh Decl. ¶ 5, saw Plaintiff eleven days later on February 22, 2019 to address the knee injury.  Def. Ex. C.  Plaintiff explicitly requested magnetic resonance imaging ("MRI") and/or a knee brace.  *Id.*

At the appointment, Defendant recorded in full:

**History of Present Illness**
45-year-old man being seen Centinela State prison Charlie clinic because 2 weeks ago while he was playing handball he twisted his right knee. He was able to walk off the court. He tried stretching his knee out but did not keep playing at that point. It was about 6 hours later that the swelling started that evening. The swelling was gone after 2 days. He states that since then his right knee has been feeling stiff in the morning. He took a little bit of naproxen that the nurse gave him and feels like it did not help. The main motion that hurts is when he tries to pivot on his right knee. Keeping his knee straight is the most comfortable position. In the meantime he has been walking and trying to do some stretches but has not done any exercises such as squats or lunges because he feels his right knee could not handle it at this point. No obvious history of locking or buckling while walking. Significantly he had right knee

---

[2] It is unclear if Plaintiff's left knee, of which he did not complain, was examined.  However, it appears this reference to Plaintiff's left knee is in error.  This description is in the box below "Knee, right" and is the only mention of Plaintiff's left knee in the medical record.

ACL repair in 1986 without any complications after. He is asking about possible MRI or getting a knee brace.

Def. Ex. C.

Following this initial intake, Defendant conduct various tests.  In particular, a visible examination of Plaintiff's knee, as well as Lachman's Test, Valgus Stress Test, Varus Stress Test, and McMurray's Test.  Koh Decl. ¶ 10.  Based upon the physical examination of Plaintiff, Defendant concluded:

> In general he is alert and in no distress, walks and talks without any significant difficulty although he seems to favor his right leg as he is walking. Focused exam of his right knee shows there is no appreciable swelling. No redness. No patellar or fibular head tenderness. He is somewhat apprehensive on exam but after coaching him and trying to get him to relax, Lachman's test, valgus and varus stress testing and McMurray's test are negative. With the patient standing he is able to squat about 80% of the way. Able to raise either thigh to 90 degrees while standing although he supports himself somewhat while standing on his right leg. Pivot shift test overall negative on right knee although he is supporting himself as he does it.

Def. Ex. C.

As a result, Defendant declined to order an MRI or prescribe Plaintiff a knee brace,[3] explaining that he "d[id] not detect any obvious pathology" and "d[id] not see any indication for MRI nor does this meet[] medical necessity or criteria for a knee brace.  He is functional." *Id.*  Defendant instead directed Plaintiff to limit "exacerbatory exercises," take 500 mg of Naproxen twice each day, and "[f]ollow-up as needed." *Id.*

Dr. Soleimani reviewed the medical records from the February 22, 2019 appointment and similarly concludes that the examination "did not reveal sufficient,

---

[3] The Court notes that Plaintiff did not make any allegations regarding his request for a knee brace in the Complaint, nor does he address the request and denial in opposition to the present motion.  Accordingly, the Court confines its analysis to whether Defendant's decision to not order an MRI violated the Eighth Amendment.

objective indicia of present injury" and that the findings were "unremarkable." Soleimani Decl. ¶ 7.

Thereafter, Plaintiff sought and received medical treatment some twenty-nine (29) times at CSP between the February 22, 2019 appointment with Defendant and his transfer to LAC on April 27, 2021.  Koh Decl. ¶ 20; Def. Exs. E–GG.  Plaintiff's knee was not the subject of any of these appointments.  DSS No. 12.  The record is replete with medical records from staff who recorded that Plaintiff presented with no "actual or suspected" knee pain during more than twenty (20) of those medical appointments for unrelated ailments and treatments.  However, the record appears to also reflect that Plaintiff reported level 7 knee pain twice to prison staff after the February 2019 appointment with Defendant, *see* Pl. Ex. A-10; Def. Exs. AA, I, and that at six of Plaintiff's appointments with Defendant, "Pain in knee" was recorded as an "Ongoing" ailment.  Def. Exs. E, F, L, G, H, AA.

Plaintiff has also put forth evidence that he continued to experience significant pain and difficulty walking for some two years before ultimately receiving treatment at LAC.  *See* Doc. No. 49-3 at 4–5 ("Castillo Decl."), 6–7 ("Panameno Decl.").  One fellow inmate states that he witnessed Plaintiff "walking in favor of his right leg/knee" and that Plaintiff "told [him] on several occasions he was in constant and consistent pain due to an injury on hand ball court."  Castillo Decl. ¶¶ 2–3.  Another inmate explains that while he was in medical holding with Plaintiff at CSP, Plaintiff relayed to him

> on several occasions that he was in EXTREME PAIN due to sports injury on handball court. He also told me he was being refused proper medical care. While I was in company of [Plaintiff] I could see he was in severe pain and favoring his right knee. I observed on multiple occasions while housed at [CSP], [Plaintiff] limping, favoring, and also complaining of right knee pain.

Panameno Decl. ¶ 3.  The evidence also reveals that Plaintiff submitted two requests for his pain medication refills, complaining that he was still in severe pain from his knee injury.  *See* Def. Ex. JJ.

As noted, once at LAC, Plaintiff saw his PCP on September 9, 2021, who prescribed him a knee brace.  Def. Ex. II.  Plaintiff ultimately received an MRI, which revealed a torn meniscus.  Pl. Ex. A-2.

Defendant asserts that Plaintiff injured his knee on the yard at LAC in 2021, *see* Ko Decl. ¶ 23, seemingly arguing that Plaintiff did not present with a torn meniscus in February 2019.  According to the September 9, 2021 medical record, Plaintiff's "pain is exacerbated when he twisted his knee on the [LAC] yard a few weeks" prior.  Def. Ex. II.  However, Dr. Antebi recorded at the April 18, 2022 MRI appointment that Plaintiff reported "hav[ing] injured the right knee while playing handball in 2019."  Pl. Ex. A-2.  Dr. Antebi also recorded that Plaintiff reported his knee pain had been "gradually increasing" since 2019.  *Id.*

As the Ninth Circuit has explained, "[i]ndications that a plaintiff has a serious medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Tecs. V. Miller*, 104 F.3d 1133 (9th Cir. 1997)).  Plaintiff had previously torn his ACL and reported that he felt the tear had re-occurred.  The reasonable patient under these circumstances would believe they had been seriously injured and needed treatment.

Further, because the Court views the evidence in Plaintiff's favor at this juncture, he is entitled to the inference that some of the damage that resulted in a tear discovered at LAC in 2021 occurred while he was at CSP in 2019.  *Cf. Egberto v. Nev. Dep't of Corr.*, 678 F. App'x 500, 504 (9th Cir. 2017) (finding on summary judgment that the plaintiff was entitled to the "inference that at least some of the additional disc involvement occurred while he was waiting to receive the MRI").  Additionally, as discussed above, Plaintiff has put forth evidence that he was in chronic and substantial pain.  Evidence of a

knee injury, resulting in chronic and severe knee pain lasting years, ultimately resulting in a torn meniscus, suffices to permit a jury to find the existence of an objectively serious medical need. *See Jackson v. Pompan*, No. C 12-6049 SI (pr), 2014 U.S. Dist. LEXIS 68656, at *8 (N.D. Cal. May 19, 2014) (finding that evidence of "chronic knee pain that turned out to include an ACL tear" is sufficient to overcome summary judgment as to the objectively serious prong). For these reasons, the Court cannot say that Plaintiff's knee injury was not objectively serious. Consequently, the Court **DENIES** Defendant's motion for summary judgment on this basis.

### 2.    *Subjectively Culpable Mental State*

Next, Defendant argues that even assuming Plaintiff's medical need was sufficiently serious, he did not act with deliberate indifference. *See* Doc. No. 41 at 18.

Deliberate indifference to serious medical needs of prisoners "may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson*, 838 F.2d at 394 (citing *Estelle*, 429 U.S. at 104–05).

In the medical care context, the standard requires more than mere misdiagnosis, medical malpractice, or even gross negligence. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). An "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. *Hutchinson*, 838 F.2d at 394 (citing *Estelle*, 429 U.S. at 105).

The Supreme Court has noted that the decision of whether to order diagnostic tests is a "matter for medical judgment." *Estelle*, 429 U.S. at 107. Moreover, "[a] difference of opinion between a physician and the prisoner—or between medical professionals— concerning what medical care is appropriate does not amount to deliberate indifference." *Colwell*, 763 F.3d at 1068. Instead, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'" *Toguchi*, 391 F.3d at 1058

(citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

The evidence, even viewed in Plaintiff's favor, shows that Defendant's decision to not order an MRI was neither medically unacceptable under the circumstances nor in conscious disregard of a substantial risk of serious injury. Plaintiff reported the following to Defendant at the February 22, 2019 appointment: he twisted his right knee play handball two (2) weeks prior, he was able to walk off the court but did not continue playing, swelling began six (6) hours later but was gone after two (2) days, his knee felt stiff in the mornings, he felt that Naproxen did not help, the main motion that hurt was pivoting on his right knee, keeping his knee straight was the most comfortable, and he had been walking and stretching but not doing certain exercises such as squatting or lunging because he felt his knee could not handle it. Def. Ex. C. Defendant was aware of Plaintiff's 1986 ACL repair surgery, but also noted that there was no "obvious history of locking or buckling while walking." *Id.*

Plaintiff's knee was not swollen, red, or tender. *Id.* Plaintiff passed all four of Defendant's pathological tests, which specifically assess possible damage to ligaments and cartilage of the knee. *Id.*; Ko Decl. ¶ 10. Additionally, Plaintiff was "able to squat about 80% of the way" and "raise either thigh to 90 degrees while standing although he support[ed] himself somewhat while standing on his right leg." Def. Ex. C. Plaintiff's pivot shift test was "overall negative on right knee" although he supported himself somewhat as he did it. *Id.* Plaintiff was able to walk without any significant difficulty, although again he seemed to favor his right leg. *Id.* Plaintiff was not in distress at the appointment. *Id.* Defendant did not detect any obvious pathology. *Id.* Defendant diagnosed Plaintiff with a knee sprain. *Id.* He did not order an MRI, but instead prescribed Plaintiff Naproxen, and directed him to limit "activities as he could easily reinjure his knee during the healing process" and follow-up as needed.[4] *Id.*

---

[4] It is undisputed that Plaintiff never saw Defendant again for an appointment specifically regarding his knee. For the reasons discussed above, *supra* Part IV.B, the parties' dispute as to whether this was due

Defendant explains that his determination that Plaintiff did not qualify for an MRI was guided by the California Department of Corrections and Rehabilitation ("CDCR") regulations and policies.  Ko Decl. ¶ 7.  Pursuant to the CDCR, "[t]he department shall only provide medical services for inmates, which are based on medical necessity and supported by outcome data as effective medical care."  Def. Ex. A; *see also* Cal. Code Regs. tit. 15, § 3350(a).  "Medically Necessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, . . . ."  Def. Ex. A; *see also* Cal. Code Regs. tit. 15, § 3350(b)(1).  "Severe pain means a degree of discomfort that significantly disables the patient from reasonable independent function."  Def. Ex. A; *see also* Cal. Code Regs. tit. 15, § 3350(b)(4).  "Significant illness and disability means any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death."  Def. Ex. A; *see also* Cal. Code Regs. tit. 15, § 3350(b)(5).  The CDCR's Health Care Department Operations Manual similarly provides that medical imaging services are to be made available if "medically necessary in order to establish diagnoses, make recommendations for additional diagnostic workup, and establish treatment plans."  Def. Ex. B.

Bearing on whether an MRI was medically necessary, Defendant notes that "all four tests were negative for signs of a significant knee pathology."  Ko Decl. ¶ 10. Defendant asserts that "Plaintiff's ability to complete most of a squat, and flex his injured knee to 90 degrees, further indicated a lack of significant pathology requiring medical imaging."  Ko Decl. ¶ 11.  Additionally, Defendant explains that "[p]ivoting is one of the most difficult motions for the knee to handle" and this "test also came back negative—

to Plaintiff's failure to seek follow-up care or Defendant's refusal is immaterial.  The question before the Court is whether Defendant's decision to not order an MRI on February 22, 2019 was medically unacceptable under the circumstances present at that time and deliberately indifferent to Plaintiff's serious medical need.

while Plaintiff supported himself somewhat, the ability of his right knee to pivot supported my belief that, with rest, the knee would continue its healing trajectory." *Id.* Therefore, according to Defendant:

> At the time of our first visit, my examination revealed that the Plaintiff was able to function independently and perform the daily activities of life. While Plaintiff indicated he was in pain, he could walk unassisted, perform knee functions, and his knee was no longer swollen. Nothing indicated that Plaintiff was unable to eat on his own, sleep, ambulate, use the restroom, etc. Nor did anything indicate that Plaintiff's condition, which was improving, would soon cause severe limitation of function or ability to perform the daily activities of life. Consequently, I determined that, on February 22, 2019, Plaintiff's MRI and knee brace requests did not meet the definition of medical necessity.

Ko Decl. ¶ 14.

Drs. Soleimani and Sekhon both agree that an MRI was not warranted based upon the record of this examination.  In particular, Dr. Soleimani explains:

> Based on my review of Plaintiff's medical record, Plaintiff was not eligible to receive an MRI for his right knee injury on February 22, 2019.  Dr. Ko's examination did not reveal sufficient, objective indicia of present injury that would have justified ordering an MRI at that time.  In addition to the fact that Mr. Orcasitas' knee finding were unremarkable he wouldn't get qualified for MRI request based on CDCR policies which follows Interqual criteria.  Based on my assessment of Dr. Ko's examination and treatment plan of Plaintiff's knee on February 22, 2019, and CDCR referral policies, I do not believe that Dr. Ko provided unacceptable care.

Soleimani Decl. ¶ 7.

Additionally, Dr. Sokhon, Plaintiff's current PCP at LAC who did ultimately order an MRI, states the following:

> Based on my review of Plaintiff's medical record, Plaintiff was not eligible to receive an MRI per CDCR Policy for his right knee injury on February 22, 2019, and I would have been unlikely to authorize one.  When I did authorize

an MRI for Plaintiff's right knee in 2021, a number of factors were present that met CDCR Interqual Criteria that were absent when Dr. Ko assessed Plaintiff's injury on February 22, 2019.  Among other things, Plaintiff had been suffering knee pain for years; Plaintiff reported joint locking; Plaintiff had attempted to use a knee brace and rub that were not resolving his pain issues; and Plaintiff had, after his knee treatment from Dr. Ko, been diagnosed with conditions that rendered over-the-counter pain medicine contraindicated here.  Based on my assessment of Dr. Ko's examination and treatment plan of Plaintiff's knee on February 22, 2019, I do not believe that dr. Ko provided unacceptable care.

Sekhon Decl. ¶ 7.

This strongly if not conclusively demonstrates that Defendant's course of treatment was medically acceptable under the circumstances.  However, according to Plaintiff, when he asked Defendant for an MRI at the February 22, 2019 appointment, Defendant responded that "M.R.I.'s are too expensive as long as I can walk to eat that's the only care he is required to give me."  Pl. Decl. ¶ 1.  Plaintiff asserts that he then told Defendant, "This is America, I am a citizen of the [U]nited [S]tates sir! I am in EXTREME PAIN I NEED HELP" and Defendant responded: "I am Doctor you are NOT, I detect no injury!"  *Id.* ¶ 2.  Plaintiff then questioned where Defendant went to medical school, *id* ¶ 3, and Defendant asked Plaintiff to leave, *id.* ¶ 4.  Plaintiff then told Defendant that he would write him up, and Defendant said "Fine!"  *Id.* ¶ 5.

Five days later, on February 27, 2019, Plaintiff submitted a Form 602 grievance. In full:

I do not go to Dr. ever. I recently injured my right knee aggr[a]vating a[n] old injury in which I tore my ACL ligament in my right knee. I had major knee surgery [to] repair that years ago. Playing hand ball I twisted & felt like I retore some ligament. I'm in severe pain day & night. Dr. Here will not order a MRI to see damage to my knee because in his words "a MRI is really expensive." I am currently in severe pain day & night. This Dr. Basically gave me generic pain-killers & said the pain will stop after 4 or 5 months? After my original injury & surgery I was given [ ] knee brace in order to prevent[] aggr[a]vating or even reinjuring my knee. Dr. here says CDCR will not

provide it unless ordered by a Dr? And he's refusing to do so. I'm in severe pain, not being properly examined (with MRI or orthopedic specialist) nor is my pain being helped [ ] by generic pain meds "Tylenol." I am suffering daily in severe pain – I am not properly being examined or being provided adequate medical care. I humbly but urgently ask that this situation be corrected immediately! Thank you for your time.

Pl. Ex. 7.

Although Plaintiff has raised a question of fact as to whether Defendant considered the cost of an MRI in making his decision, this dispute is insufficient to overcome summary judgment on this record.  For one, the argument assumes that an MRI was medically necessary, and the record reveals that it was not.  Second, other courts have held that consideration of medical costs alone does not amount to deliberate indifference. *See Nava v. Velardi*, No. 15cv1156-AJB(BLM), 2018 U.S. Dist. LEXIS 134766, at *40–41 (S.D. Cal. Aug. 9, 2018) (first citing *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) (en banc) ("A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate."); then citing *Patterson v. Lilley*, No. 02 Civ. 6056 (NRB), 2003 U.S. Dist. LEXIS 11097, at *19 (S.D.N.Y. June 20, 2003) (granting defendants' motion to dismiss and "not[ing] that consideration of cost factors in choosing a course of treatment of a prisoner is, in and of itself, no more violative of a prisoner's constitutional rights than is, for example, the consideration of the cost of providing prescription drug coverage to non-incarcerated recipients of Medicare"); then citing *Caines v. Hendricks*, No. 05-1701 (JAP), 2007 U.S. Dist. LEXIS 9453, at *21 (D.N.J. Feb. 8, 2007) (granting defendants' motion for summary judgment and noting that "it is not a constitutional violation for prison authorities to consider the cost implications of various procedures, which inevitably may result in various tests or procedures being deferred unless absolutely necessary. The deliberate indifference standard 'does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.'") (first quoting *Reynolds v. Wagner*, 128

F.3d 166, 175 (3d Cir. 1997); and then citing *Brightwell v. Lehman*, No. 03-205J, 2005 U.S. Dist. LEXIS 48050, at *23 (W.D. Pa. Dec. 5, 2005) ("Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference even if a prisoner does not receive the most costly treatments or his treatment of choice."), *report and recommendation adopted by Brightwell v. Lehman*, Civil Action No. 03 - 205J, 2006 U.S. Dist. LEXIS 98862, at *4 (W.D. Pa. Apr. 10, 2006)); and then citing *Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011) (determining allegation that a doctor treated plaintiff with a hernia belt rather than surgery based on the cost of surgery was insufficient to state a claim of deliberate indifference because "the naked assertion that Defendants considered cost in treating [plaintiff's] hernia does not suffice to state a claim for deliberate indifference as prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment")). Here, the record reveals that Plaintiff was not denied an MRI solely because of its cost but because Defendant found that it was not medically necessary. Accordingly, Plaintiff's disagreement with Defendant's decision to not order an MRI on February 22, 2019 is merely a difference of opinion that does not amount to deliberate indifference.

In sum, there is a question of fact as to when Plaintiff tore his meniscus, for example, whether the tear occurred at CSP on February 6, 2019, at LAC in August 2021, or sometime in between. However, the record reveals no factual issues regarding Defendant's alleged deliberate indifference: Defendant's chosen treatment—including to not order an MRI—was not medically unacceptable under the circumstances. That Defendant may have commented on or considered the cost of ordering an MRI does not raise a triable issue sufficient to overcome the overwhelming evidence demonstrating that Defendant came to the medically sound decision on February 22, 2019 that Plaintiff did not qualify for an MRI under CDCR policy. Further, even assuming Plaintiff presented with a torn meniscus on February 22, 2019, Defendant's failure to detect the injury would at most support a finding of negligence or malpractice, both of which are insufficient to

succeed on an Eighth Amendment medical care claim.  There is no evidence in the record that Defendant subjectively knew on February 22, 2019 that if he did not order an MRI there was a substantial risk that Plaintiff would suffer serious harm and that Defendant consciously disregarded that risk.[5]  Accordingly, the Court **GRANTS** summary judgment in Defendant's favor.

Because the Court finds that Defendant is entitled to summary judgment as to the merits of Plaintiff's claim, it need not reach Defendant's alternative request for qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

## V. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's motion for summary judgment.  Consequently, the Court **DENIES** Plaintiff's motion for appointment of counsel.  The Clerk of Court is directed to enter judgment in Defendant's favor and close this case.

**IT IS SO ORDERED**.

Dated:  December 7, 2022

HON. MICHAEL M. ANELLO
United States District Judge

---

[5] To the extent Plaintiff seeks to demonstrate Defendant's alleged deliberate indifference by pointing to evidence of Defendant's knowledge of Plaintiff's continued pain and failure to provide follow-up care after the appointment, these allegations are beyond the scope of the Complaint and this evidence does not bear on Defendant's culpability and state of mind on February 22, 2019.